# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

LIONEL LECHUGA,          )
                             )
        Petitioner,       )
                             )     No. 12 C 8910
    v.                      )
                             )     Chief Judge Rubén Castillo
UNITED STATES OF AMERICA,  )
                             )
        Respondent.     )

## <u>MEMORANDUM OPINION AND ORDER</u>

Lionel Lechuga ("Petitioner") is serving a 20-year sentence for his participation in a racketeering and narcotics conspiracy. He filed a petition to vacate his sentence under 28 U.S.C. § 2255 ("the Petition"). (R. 1, Pet.) For the reasons set forth below, the Petition is denied.

## BACKGROUND

### I.     Petitioner's Conviction

The facts underlying Petitioner's conviction are set forth in three opinions by the Seventh Circuit, and several orders of this Court. *See United States v. Morales*, 655 F.3d 608 (7th Cir. 2011); *United States v. Benabe*, 654 F.3d 753 (7th Cir. 2011); *United States v. Benabe*, 436 Fed. App'x 639 (7th Cir. Aug. 18, 2011) (per curiam); *United States v. Delatorre*, 572 F. Supp. 2d 967 (N.D. Ill. 2008); *United States v. Delatorre*, 522 F. Supp. 2d 1034 (N.D. Ill. 2007); *United States v. Delatorre*, 508 F. Supp. 2d 648 (N.D. Ill. 2007); *United States v. Delatorre*, 438 F. Supp. 2d 892 (N.D. Ill. 2006). They are repeated here only as they pertain to the present Petition.

## A.    The Insane Deuces Street Gang

In 2002, state and federal authorities began an intensive investigation into the Insane Deuces street gang after one of its members, Orlando Rivera, agreed to serve as a confidential informant. *Morales*, 655 F.3d at 615. Petitioner was among sixteen men indicted on various racketeering-related charges in connection with the investigation. *Id.* The evidence adduced at trial showed that the Insane Deuce Nation (the "Insane Deuces") was an organized street gang affiliated with the Folks, a national network of local gangs. *Id.* The gang was predominantly made up of Latino/Hispanic males and operated primarily within northern Illinois, though other factions existed throughout Illinois and various state and federal prisons. *Id.* The government's investigation focused on the Aurora Deuces, a chapter of the Insane Deuces with a significant presence in Aurora, Illinois. *Id.* As of 2002, the Aurora Deuces had become bitter rivals of the Latin Kings (also referred to as the "Kings"). *Id.* at 616. This rivalry resulted in "frequent and escalating violence," and often resulted in attacks on innocent persons who were mistakenly believed to be rival gang members. *Id.*

The Insane Deuces had its own set of "leyas," or laws, as well as a detailed hierarchy. *Id.* There were three tiers of membership within the gang: Seniors, Juniors, and Shorties. *Id.* Shorties were the gang's youngest members, and they held the responsibility of carrying out most of the gang's activities, including shootings and other acts of violence, as well as selling drugs to fund the gang. *Id.* Shorties were often juveniles who were recruited to increase the gang's ranks. *Id.* By participating in gang activities, Shorties could work their way up to becoming Juniors, who were responsible for the gang's day-to-day operations. *Id.* Juniors directed Shorties in their activities, including determining who would participate in particular acts of violence, distributing firearms, and otherwise supervising the Shorties' activities. *Id.*

Seniors were "longstanding members of the gang whose age and accomplishments made them the leaders, broad-scope planners, and advisors for the gang." *Id.* Seniors directed Juniors on larger issues, but they were more removed from the gang's day-to-day activities. *Id.*

The gang's daily activities included selling drugs to benefit the gang, carrying out "missions" (attacks on rival gang members), protecting and supporting fellow gang members and their families, punishing gang members who violated the gang's rules, and conducting meetings to further these goals. *Id.* The gang also maintained a "caja" system, which was "a loose form of community property and money acquired for the benefit of gang members." *Id.* For instance, if a gang member was arrested, other members of the gang could use money from the caja to bail him out of jail. *Id.* The caja also included a stash of drugs from which a gang member could borrow to make sales or trades for the benefit of the gang. *Id.* Gang members were also permitted to sell drugs from outside sources, but all sales needed to benefit the gang in some way, usually by paying part of the proceeds into the caja. *Id.* Profits from drug sales were used to purchase firearms for the gang. *Id.* These guns were used to conduct missions and to protect fellow gang members, and were usually returned to the caja after the mission was completed, unless they were disposed of to avoid ballistics evidence after someone was killed. *Id.*

Participation in the gang was mandatory for Juniors and Shorties; this included gang members who were "rolled back" from Senior to Junior status in 2002 as part of an effort to better train and lead the gang's growing number of Shorties. *Id.* Every Junior and Shorty member had to pay dues to the caja. *Id.* Missions were assigned to specific gang members, usually Shorties, and primarily consisted of attacks on rival gang members in retaliation for acts of violence or perceived encroachment on the gang's territory. *Id.* at 616-17. Guns were distributed for these missions, and gang members were directed to empty the entire magazine or

suffer punishment for every bullet that was not fired. *Id.* at 617. In addition to these planned attacks, members of the gang were required to comply with a "standing order" to attack Latin Kings whenever they had the opportunity to do so. *Id.* Members worked their way up through the gang by participating in missions and other acts of violence, and by donating money or firearms to the caja through drug sales or theft. *Id.* In exchange for their participation, gang members and their families received financial support and physical protection; these benefits applied to gang members on the street as well as those members incarcerated in correctional facilities throughout Illinois. *Id.*

Working with law enforcement, Rivera surreptitiously recorded several meetings and conversations between Insane Deuces, reported on the gang's activities and plans, and conducted controlled buys of narcotics and firearms from gang members. *Id.* The intelligence gathered through Rivera produced evidence regarding "four murders, eleven attempted murders, two solicitations to commit murder, other shootings, and narcotics distribution incidents—all of which the Deuces perpetrated in 2002 alone." *Id.* From information obtained through Rivera, government authorities learned about each of the defendants' roles in the gang. *Id.* The Seventh Circuit summarized Petitioner's involvement in the gang as follows:

> Lechuga was another older Deuce who had been rolled back to Junior status. The record shows conflicting accounts of his previous status: he asserts that he was retired and that he was pulled back in when Deuce leadership raised the retirement age to 35, but contrary evidence indicated that he was a Senior Deuce prior to the rollback. Regardless, he was upset with the manner of the rollback, but nevertheless did resume active participation in the gang's affairs. He also noted that he'd remained willing to be involved while in retired or Senior status. He counseled Deuce leaders on how best to carry out inter-gang warfare within the Folks network without risking their ability to protect their members in prison. He also advocated changes in the caja system to increase efficiency in fronting drugs to gang members, perhaps as a result of his being unable to obtain from an enforcer the cocaine he'd requested for resale in July 2002.

*Id.* at 618.

## B.    Trial Proceedings

Following an extensive investigation, a federal grand jury indicted Petitioner and fifteen other Insane Deuces on charges of racketeering conspiracy; assault with a dangerous weapon, murder, attempted murder, and conspiracy to commit murder in aid of racketeering activities; illegal possession of firearms; distribution and possession of narcotics; and conspiracy to distribute narcotics. *Id.* One of the sixteen pled guilty, and another remained a fugitive. *Id.* The Court divided the remaining fourteen defendants into two groups for purposes of trial. *Id.* Petitioner was grouped with the "less major players," which was to be tried before U.S. District Judge Harry D. Leinenweber. *Id.* In December 2007, the government filed a notice of prior conviction pursuant to 21 U.S.C. § 851 ("851 Notice"), which raised Petitioner's mandatory minimum sentence on the drug conspiracy count to 20 years in prison, based on his prior conviction for manufacture/delivery of cocaine. (R. 50, Stip. Facts ¶ 11.)

In April 2008, Judge Leinenweber commenced the trial of the less major players. *United States v. Morales*, No. 03 CR 90, 2009 WL 1456567, at *1 (N.D. Ill. May 22, 2009). However, a mistrial was declared shortly after opening statements, when several jurors asked to be removed from the jury due to concerns about their safety. *Id.* The retrial was scheduled for October 2008. *Id.* In the interim, the trial of the other group of defendants—the so-called "leaders" of the gang—proceeded before this Court, and all but one of the defendants were convicted of racketeering conspiracy and other offenses.[1] *Benabe*, 654 F.3d at 757.

In October 2008, a retrial of the less major players was held. *Morales*, 655 F.3d at 619. On the government's motion, Judge Leinenweber empaneled an anonymous jury. *Id.* The trial

---

[1] The jury could not reach a verdict as to defendant Harold Crowder. *Benabe*, 654 F.3d at 757 n.1. He was later retried with the second group of defendants and convicted on all charges. *See Morales*, 655 F.3d at 615.

spanned more than two months, during which time the government presented extensive witness testimony, recordings of gang meetings, and forensic evidence establishing the gang's activities, rules, and purpose. *Id.* The government's key witness, Rivera, described the inner workings of the gang, explained what was said in the various recorded meetings, and described the gang's organization and means of rule enforcement. *Id.* Two other former gang members, Lorenzo Becerra and Akeem Horton, testified in cooperation with the government regarding the gang's activities and the scope of participation of each individual defendant. *Id.* The government also presented testimony from a variety of police officers and federal agents, as well as several victims of the violence perpetrated by the gang. *Id.*

After a week of deliberations, the jury returned its verdicts finding Petitioner and all but one other defendant guilty of racketeering conspiracy.[2] *Id.* The jury also found Petitioner and others guilty of distribution of narcotics. *Id.* A second phase of the trial was then conducted, wherein the jury returned special verdicts as to each defendant; "the special verdicts were highly individualized, differentiating between the defendants on shared counts." *Id.* As to Petitioner, the jury found that the government had not proven the drug amounts listed on the verdict form. (R. 50, Stip. Facts ¶ 21.) Specifically, the jury found that Petitioner was involved in a narcotics conspiracy involving less than 500 grams of cocaine, and no crack cocaine or marijuana. (*Id.*) Petitioner was ultimately sentenced to 20 years on the RICO count and 20 years on the drug count, to run concurrently. (R. 50, Stip. Facts ¶ 25.)

On appeal, the defendants raised a variety of joint and individual arguments in what the Seventh Circuit described as a "virtual cannonade of briefing[.]" *Morales*, 655 F.3d at 620.

---

[2]  The jury could not reach a verdict as to defendant Steven Perez. He was later retried before this Court and convicted on all charges. *See United States v. Perez*, 673 F.3d 667, 668 (7th Cir. 2012).

Jointly, the defendants argued that the Court erred in empanelling an anonymous jury, erred in denying their motions for severance, and erred in handling an allegation of juror misconduct that arose during the trial. *Id.* at 620-26. Petitioner separately argued that there was insufficient evidence to support his conviction because of the evidence demonstrating that he had withdrawn from the gang years earlier. *Id.* at 640-41. He also raised two arguments related to his sentence: that the Court erred in holding him accountable for violent acts committed by other gang members, and erred in categorizing him as a career offender. *Id.* at 641-43. In a lengthy published opinion, the Seventh Circuit rejected each of these arguments and affirmed Petitioner's conviction and sentence in all respects. *Id.* at 620-47.

## II.    Section 2255 Petition

In November 2012, Petitioner filed the present Petition. (R. 1, Pet.) He claims that he received ineffective assistance from his trial counsel, Patrick Blegen, because Blegen failed to advise him that his past criminal history qualified him as a career offender under the United States Sentencing Guidelines ("the Guidelines"). (*Id.* at 1-2.) Petitioner claims that Blegen's deficient advice on this issue caused him to reject a favorable plea offer made by the government during the trial. (*Id.*) Upon Petitioner's request, this Court appointed counsel to represent him in connection with his Petition. (R. 17, Min. Entry.) The Court expresses its gratitude to attorneys Erica Zunkel and Alison Siegler of the Mandel Legal Aid Clinic, as well as their students from the University of Chicago Law School, for their excellent representation of Petitioner in this matter. The Court likewise commends Ashwin Cattamanchi, a Federal Defender with the U.S. District Court for the Northern District of Indiana, who generously served as an expert in this case *pro bono*, spending many hours of his own time reviewing documents and testifying at an evidentiary hearing.

On October 30, 2014, and November 6, 2014, the Court held an evidentiary hearing on the Petition, taking testimony from Petitioner, Blegen, several prosecutors involved in the case, and Petitioner's expert, Cattamanchi. (*See* R. 55, Min. Entry; R. 56, Min. Entry.) Following the evidentiary hearing, the parties submitted extensive post-hearing briefs and exhibits for this Court's consideration. (*See* R. 61, Pet'r's Br.; R. 63, Gov't's Resp.; R. 67, Pet'r's Reply; R. 61-1 to R. 61-42, Exs.)

## A.      Blegen's Representation and Sentencing Calculations

At the evidentiary hearing, Blegen testified that he was admitted to the bar in 1994 and had been a member of this District's Criminal Justice Act ("CJA") panel for approximately 15 years. (Tr. at 120.) Blegen had handled many drug trials and two RICO conspiracy trials prior to handling Petitioner's case. (Tr. at 176.) He was well acquainted with the maximum penalties for RICO charges and federal drug offenses. (*Id.*) Blegen filed his appearance in January 2008; at that point, the Indictment had been pending against Petitioner for more than two years and the scheduled trial date was a little more than two months away. (Tr. at 122; *see also Delatorre*, R. 42, First Superseding Indictment.) Blegen took over the case at the request of a colleague, James Tunick, who due to scheduling difficulties had been unable to file a number of pretrial motions Petitioner had asked him to file.[3] (Tr. at 122; *see also Delatorre*, R. 668, Mot. to Withdraw.) Blegen was told by Tunick that "the case [] was going to go to trial." (Tr. at 122.) Blegen also understood from Tunick that no matter what had transpired up until that point, "the trial date was

---

[3]  The record reflects that Tunick was appointed to represent Petitioner on September 29, 2005, after it was determined that Petitioner was indigent and could not afford counsel on his own. (R. 50, Stip. Facts ¶¶ 4-5.) In November 2005, attorney Vincent Solano filed an appearance on Petitioner's behalf as retained counsel, and Tunick was granted leave to withdraw. (*Id.* ¶ 8.) In July 2007, Solano withdrew from the case and Tunick was again appointed to represent Petitioner. (*Id.* ¶ 10.)

not getting moved." (Tr. at 173.) Thus, Blegen worked quickly to get up to speed on the case and prepare for trial, spending hundreds of hours working on the case. (Tr. at 174.)

According to Blegen, Petitioner was "very involved" in his case from the very beginning. (Tr. at 174-75.) In fact, it was Petitioner who first suggested the defense strategy adopted by Blegen, which was that Petitioner had withdrawn from the gang several years before the government's investigation began. (Tr. at 175.) Petitioner wrote letters to Blegen regularly, conducted his own legal research, and sent Blegen ideas regarding the upcoming trial. (Tr. at 82-83, 175.) In one such letter written in March 2008, Petitioner told Blegen that he was "impressed" with his handling of the case thus far. (R. 61-2, Letter of 3/11/08 at 1.) Petitioner mentioned having done some legal research on a sentencing issue, and asked Blegen a question about whether a particular case might be applied to him, stating that he was "going to continue doing some research." (*Id.*) He then stated: "I can't see myself pleading guilty to a drug conspiracy. What are the chances of me pleading guilty to count one only? Either way, we must prepare for trial, so I'm sending you a few ideas, questions, etc." (*Id.*) In the following two pages, Petitioner outlined various weaknesses in the government's evidence and offered detailed suggestions for Blegen's cross-examination of Rivera. (*Id.*)

As part of his preparation of the case, Blegen reviewed Petitioner's criminal history. (Tr. at 126-27.) In part, Blegen was looking for prior convictions that could be used to cross-examine Petitioner in the event he testified at trial, which at that point was a "strong possibility." (Tr. at 127.) After reviewing Petitioner's criminal history records, Blegen calculated Petitioner's criminal history category as IV or V under the Guidelines. (Tr. at 128-29, 166.) Blegen did not

realize at that time that Petitioner qualified as a career offender.[4] (Tr. at 136-37, 166.) Blegen was familiar with the career offender Guidelines and the required predicates to trigger them; he also understood that the charges against Petitioner could implicate the career offender Guidelines. (Tr. at 135-36.) Specifically, he was aware that Petitioner had a prior state conviction for manufacture/delivery of cocaine that could be used as a career offender predicate. (Tr. at 136.) Blegen was also aware that Petitioner had a prior state marijuana conviction, but he mistakenly believed that the conviction was for possession of marijuana, which is not a predicate offense. (Tr. at 136.) The conviction was actually for distribution of marijuana, which is a predicate offense for purposes of the career offender Guidelines. (Tr. at 136-37.) Blegen's mistake was based on his misreading of an entry in Petitioner's National Crime Information Center ("NCIC") rap sheet. (Tr. at 136.) As Blegen explained:

> [The NCIC report] says Count 1, manufacture/delivery of marijuana; Count 2, possession of marijuana, and then a couple lines below it's got Count 1, nolle pros'd; Count 2, probation. What I missed and didn't realize until after the fact is that the rap sheet flip flopped 1 and 2, and so that what was really dismissed was the marijuana possession, not the manufacture/delivery, and I will—looking at it now, it's as obvious as day to me. I—looking at it then, I did not read it that way. I always read it as manufacture/delivery being nolle pros'd, meaning dismissed.

(Tr. at 136-37.) Blegen recalled having looked at the NCIC rap sheet and thinking, "[W]hew, he's not a career offender because it's a possession, not a manufacture/delivery or distribution conviction." (Tr. at 137.)

Blegen's misunderstanding was also based on his own experience as a defense attorney in state court. (Tr. at 199-201.) In Blegen's experience, it is common for a defendant to plead

---

[4] To be a "career offender," a defendant must be convicted of a controlled substance offense or a crime of violence after incurring at least two prior felony convictions for either a crime of violence or a controlled substance offense. U.S.S.G. § 4B1.1. Only "unrelated" prior offenses count as a prior conviction. See U.S.S.G. §§ 4B1.2(c), 4A1.2(a)(2). A defendant who qualifies as a career offender is automatically placed in criminal history category VI and may also receive a higher offense level. See U.S.S.G. § 4B1.1.

guilty to a drug possession offense in exchange for a sentence of probation and dismissal of the manufacture/delivery charge. (Tr. at 200.) Thus, the disposition of Petitioner's state drug case, as Blegen read it, made "intuitive sense" to him. (Tr. at 201.) Blegen testified that although he had since come to understand his error, the actual disposition of Petitioner's criminal case—a plea to a manufacture/delivery charge in exchange for a sentence of probation and dismissal of a possession charge—was in his experience "unusual."[5] (Tr. at 200.)

The prosecutors involved in Petitioner's case, Assistant U.S. Attorneys Victoria Peters, Patrick Pope, Jody Gleason, and (now U.S. District Judge) John Blakey, were also unaware that Petitioner qualified as a career offender, even though the government did its own Guidelines calculation for Petitioner prior to trial. (Tr. at 237; R. 50, Stip. Facts ¶ 24; Tr. at 170, 223, 247, 325.) The error was not revealed until sentencing, when the parties received the Pre-Sentence Report ("PSR") containing a complete list of Petitioner's prior offenses. (R. 50, Stip. Facts ¶ 24.) Petitioner apparently did not realize his prior conviction was for marijuana distribution until that time either. In a letter Petitioner sent to Blegen after the error was revealed, he stated: "I'm also enclosing part of my criminal history from [illegible] discovery. Look what it says about the conviction for marijuana. . . . I don't think it was your fault that we didn't know that it would be used against me for career offender [purposes]." (R. 61-5, Letter of 8/21/09 at 6.) After receiving the PSR, Blegen directed his investigator to obtain state court records relating to

---

[5] Notes of an August 2008 meeting between Blegen and Petitioner, which was after the mistrial but before the retrial, reflect the following notation: "Marijuana selling, jail." (R. 61-35, Meeting Notes at 699.) The notation was made by Blegen's law clerk, and Blegen did not have any specific recollection of Petitioner giving him that information. (Tr. at 130, 132.) Blegen testified that the purpose of that meeting was not to gather information for a criminal history calculation, but to discuss Petitioner's past in preparation for trial. (Tr. at 131.) This section also includes the following notations: "Fights, drugs, throwing bricks at cars"; "Sold a little coke and weed, 8 ball quarter every two weeks"; "Jail for selling coke"; "Stolen plate on car, jail." The remaining three pages of notes are focused on trial preparations. (*See* R. 61-35, Meeting Notes of 8/12/08 at 698-700.)

Petitioner's prior convictions to verify that they were correctly reflected in the PSR.[6] (Tr. at 138-39.) Blegen reviewed those records and concluded that the PSR properly categorized Petitioner as a career offender. (Tr. at 139-40.)

## B.    The Government's Plea Proposals

During the course of the trial proceedings, two different potential plea agreements were discussed by Blegen and the government. Blegen testified that the government's first plea proposal involved "a plea to the drug count, with the government dropping the 851 to result in a range of 10 to life." (Tr. at 142.) In Blegen's experience, this was a routine proposal made by the government, and it ordinarily did not require a proffer by the defendant. (Tr. at 142.) Blegen spoke to Petitioner about this initial plea proposal after the mistrial was declared and before the second trial began. (Tr. at 143.) In light of the mistrial, which was declared after several jurors expressed concerns about their safety, Blegen encouraged Petitioner to give careful consideration to the government's plea proposal, but Petitioner said that he wanted to wait on the outcome of the trial proceeding before this Court. (Tr. at 143.) As Blegen explained:

> [The mistrial] tied very much into what I had been telling [Petitioner] all along, which was I think you do have a good defense. I agree with you. One of the big worries we have is whether jurors are going to be able to put aside their emotions and fears and all that stuff to acquit you. After that happened, meaning Judge Leinenweber declared the mistrial, I remember talking to Leo and saying you really should more strongly consider that offer now because now you see how jurors react to these kinds of cases. I have seen in the notes and my recollection is he said I'll think about it and I want to see what happens to the case in front of Judge Castillo.

(Tr. at 143-44.) Once the trial of the other group of defendants concluded, Blegen sent Petitioner all the transcripts, jury instructions, and pleadings from that trial for his review. (Tr. at 148-49.)

---

[6] Among other matters, Blegen and his staff made efforts to obtain records showing that Petitioner's prior state conviction for felony escape (also a potential career offender predicate) had been reversed by the state appellate court, because "probation seemed to not be finding that it had been reversed on appeal." (Tr. at 141.)

The retrial of Petitioner and his co-defendants began in October 2008. (R. 50, Stip. Facts ¶ 17.) Petitioner's defense strategy was to argue that he had withdrawn from the gang several years earlier. (Tr. at 149-50.) Blegen viewed this defense as "very good" based on what he saw as "a gigantic gap in the evidence of time of [Petitioner] doing anything" on behalf of the gang. (Tr. at 150.) However, Blegen acknowledged that the withdrawal defense had two problems: specifically, Petitioner's recorded statements from two gang meetings in 2002, and the extensive evidence of violent acts committed by other members of the gang. (Tr. at 150.) As to the second problem, Blegen explained to Petitioner that he was concerned about "the general difficulty that jurors have in these kind of cases where there's a lot of ugly evidence of violence and gang activity, and I think there was [a] witness in a wheelchair who had been shot. All that kind of stuff I think makes it difficult for jurors to focus on the facts and the law." (Tr. at 150.)

In late October 2008, shortly after Rivera's testimony concluded, Blegen had discussions with the government about a potential plea offer.[7] (Tr. at 153-54.) The proposal was for Petitioner to plead guilty to the RICO conspiracy charge in exchange for a sentencing range of 0 to 20 years, or a "locked-in" 15-year sentence. (Tr. at 58, 154-55.) Petitioner would be required to make a proffer to the government as part of the plea proposal. (Tr. at 154.) Such a proffer would include, at a minimum, information about the activities of Petitioner and his co-defendants during his nearly 20 years in the gang. (Tr. at 222, 229-32, 246-47, 335-36, 348.) Both Blegen and Petitioner understood that without a proffer, there would be no plea agreement. (Tr. at 68-69, 161-62, 183-84.) If Petitioner did not accept the proposal, the government intended to seek

---

[7] The attorneys involved in this case had somewhat different recollections about who first initiated the mid-trial plea discussions. (*See* Tr. at 153, 249, 333.) These differences—which are understandable given that seven years have passed since the trial took place—are of no significance to the outcome of the Petition.

life imprisonment. (Tr. at 154.) The government placed a short deadline on the offer, requiring Petitioner to make a decision by the following week. (Tr. at 156-57.)

Blegen reviewed Petitioner's criminal history records "for a decent amount of time" in connection with the plea offer. (Tr. at 127-28.) In Blegen's view, the sentencing calculation was "complicated by the fact of [his] particular defense of withdrawal because . . . depending on whether he was successful or not, that would affect which criminal history points counted and did not count because of their age." (Tr. at 129.) Blegen met with Petitioner approximately three times to discuss the government's plea proposal. (Tr. at 58, 156.) Contemporaneous notes taken by Blegen's law clerk from a meeting on November 8, 2008, reflect that Blegen and Petitioner discussed the following terms: "Options are 0-20 or 15, no 0-15. They are seeking life if he loses." (R. 61-10, Meeting Notes of 11/8/08 at 15.) The notes further state, "Gotta proffer," meaning that Petitioner was required to provide information to the government as part of the plea. (*Id.*; Tr. at 161, 187.) Notes from a second meeting on November 10, 2008, reflect the same information: "Gotta proffer. They want him talking about the others." (R. 61-11, Meeting Notes of 11/10/08 at 17.) Petitioner requested that Blegen make a counter-proposal to the government involving a sentencing range of 0 to 15 years, but the government rejected this proposal. (Tr. at 156, 186.)

In connection with the plea offer, Blegen spoke to Petitioner about his sentencing exposure if he were to be convicted at trial. (Tr. at 165.) As to the RICO conspiracy count, Blegen testified that he told Petitioner that he could be held accountable for the violent conduct of his co-defendants, and that if he was, he would be facing a life sentence. (Tr. at 165.) As to the drug count, Blegen testified that he told Petitioner that in his view there was "plenty of evidence" to support the drug quantities charged by the government. (Tr. at 165.) Petitioner and

Blegen had "multiple discussions" about how "we can try to get out from under this 20-year mandatory minimum" on the drug count. (Tr. at 180.) Petitioner personally researched the issue, sending Blegen a case and inquiring whether the Court had discretion to impose a lower sentence than the minimum sentence mandated by the statute. (Tr. at 182-83.)

Blegen testified that he advised Petitioner that if the drug quantity findings were resolved against him, he would be facing a mandatory minimum of 20 years in prison and a maximum sentence of life. (Tr. at 179-80.) Blegen further testified that he told Petitioner that if he went to trial and lost, he was likely facing "close to and above" 20 years in prison. (Tr. at 168.) Blegen testified that he never told Petitioner that he would get a sentence of less than 15 years if he lost at trial. (Tr. at 193.) Blegen knew that other Insane Deuces who were testifying on behalf of the government had received sentences of 14 or 15 years, and he "did not think that a judge was going to have [Petitioner] do better than the cooperators." (Tr. at 170.) Blegen testified that he "did not really push [Petitioner] one way or the other to take or reject the deal, and [Petitioner] didn't really ask [Blegen] at that point in time, what would you do or what do you think I should do." (Tr. at 167-68.) Rather, Blegen simply advised Petitioner what he thought Petitioner would be facing in terms of a sentence if he took the plea as opposed to going to trial.[8] (Tr. at 167.) Blegen testified that he felt the 15-year fixed term was the better deal. (Tr. at 170.) He testified that he told Petitioner at the time, "[D]on't do this, meaning the 0 to 20, if you can't live with 15 because I don't think you're going to do better than that." (Tr. at 170.) Blegen's billing records

---

[8] At sentencing, Blegen told Judge Leinenweber that had he known of Petitioner's career offender status earlier, he "would have stood on [Petitioner's] neck" to try to convince him to take the plea offer. (*Delatorre*, R. 1775, *Sentencing* Tr. at 85.) This statement was made in the context of an argument by Blegen challenging the government's assertion that a sentence of no less than 30 years was warranted; Blegen pointed out that at the time of the mid-trial plea offer, the government believed a 15-year sentence was appropriate for Petitioner's role in the conspiracy. (*Id.*)

reflect that he spent approximately 12 hours researching Petitioner's sentencing exposure under the Guidelines and discussing his predictions with Petitioner at the time of the mid-trial plea offer.[9] (R. 61-16, Interim Billing Records of 12/15/08; R. 61-17, Pre-Bill Work Sheet Dated 9/2/09.) According to Blegen, after he and Petitioner discussed the proposed plea and various sentencing possibilities, Petitioner decided that he did not want to proffer and did not want to accept the plea. (Tr. at 193-94.)

Blegen also had some preliminary discussions with one of the prosecutors about the factual basis of a possible plea. (Tr. at 157-58.) Blegen testified that in his view Petitioner was "never going to admit that he didn't leave the gang . . . that he never withdrew." (Tr. at 158.) Blegen discussed with one of the prosecutors that Petitioner would agree that he "had gone from a Senior inactive status to an active Junior status. So he would sort of plead to have been brought back into the gang in this rollback." (Tr. at 157-58.) However, Blegen and the government never "pinned down an exact factual basis" for a plea, because plea negotiations did not progress that far. (Tr. at 158.) Blegen also never received a written plea agreement from the government. (Tr. at 196.) Although the plea was never reduced to writing, based on Blegen's experience, he believed that the plea "was a done deal if [Petitioner] wanted it." (Tr. at 159-60.)

Petitioner was aware that the government had filed an 851 Notice, which subjected him to a potential life sentence. (*See* Tr. at 47-48; R. 61-36, 851 Notice; R. 61-2, Letter of 3/11/08 at

---

[9] Blegen's billing records reflect the following entries: 10/24/2008: "call w/ Blakey re plea offer," .4 hours; 10/24/2008: "reviewing guidelines re: plea only to racketeering conspiracy," 2.20 hours; 10/27/2008: "reviewing guidelines & criminal history re: proposed plea," 2.00 hours; 10/27/2008: "meeting w/ client re: proposed plea," 1.5 hours; 10/28/2008: "calls w/ Blakey re: proposed plea & Lechuga's brother," .5 hours; 11/8/2008: "meeting w/ client at MCC," 2 hours; 11/10/2008: "reviewing indictment & guidelines for discussion w/ Lechuga," 2.40 hours; 11/10/2008: "call w/ Blakey re: deal," .1 hours; 11/10/2008: "meeting w/ client & Rufo at MCC," 2 hours; 11/10/2008: "call w/ Blake[y] re: offer," .2 hours. (R. 61-16, Interim Billing Records of 12/15/08 at 109-110, 119-120.)

1.) Petitioner claims that in advising him about his possible sentence, Blegen told him "that the minimum was based on the amount of drugs that I'd be convicted of, that it could go up, but it could go down." (Tr. at 48.) He further claims that Blegen told him that "it was possible to get a lesser sentence if we beat the drug amount[.]" (Tr. at 92.) Petitioner knew that some of his co-defendants in the earlier trial had received favorable special verdicts relating to the drug amounts. (Tr. at 49-50, 149.) At the time of the plea offer, Petitioner "thought 15 was too much," and "thought [he] could do better than 15." (Tr. at 92.)

Petitioner does not remember Blegen advising him that he could be held accountable for the murders committed by other gang members. (Tr. at 88-89; 168, 177.) He understood that the government was going to "try" to obtain a life sentence, and that "it was possible" for this sentence to be imposed, but he felt this was not likely. (Tr. at 90.) In his words: "I had a good enough argument from what I had seen and the evidence that I had seen—that it was possible for me to get a way lower sentence than that." (Tr. at 90.) Petitioner's recollection was that Blegen advised him he was in criminal history category III or IV. (Tr. at 60.) Petitioner testified that because Blegen never told him about his career offender status, he did not realize he was a career offender until sentencing. (Tr. at 71.) Petitioner was upset when he learned this information at sentencing and wrote Blegen a letter stating: "I thought that if I did get convicted on the drug conspiracy, that I would have a small drug amount, and that would be in my favor. But now that doesn't matter cause [sic] I'm a career offender!" (R. 61-5, Letter dated 8/21/09 at 8.) Petitioner testified that with accurate advice from Blegen on this issue, he would have accepted the plea offer with a 15-year fixed term because "that would have given me the least exposure, least amount of time." (Tr. at 71.) Petitioner requests that this Court vacate his sentence and resentence him to a 15-year term. (R. 61, Pet'r's Br. at 6-7.)

## LEGAL STANDARD

Under 28 U.S.C. § 2255, a prisoner can seek to vacate his sentence on "the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255. "Relief under this statute is available only in extraordinary situations, such as an error of constitutional or jurisdictional magnitude or where a fundamental defect has occurred which results in a complete miscarriage of justice." *Blake v. United States*, 723 F.3d 870, 878-79 (7th Cir. 2013).

## ANALYSIS

Petition's sole claim is that he received ineffective assistance from Blegen in connection with the government's proposed plea offer. (R. 1, Pet. at 1-20; R. 61, Pet'r's Br. at 6-47.) Under the Sixth Amendment, a criminal defendant is entitled to "'effective assistance of counsel'—that is, representation that does not fall 'below an objective standard of reasonableness' in light of 'prevailing professional norms.'" *Bobby v. Van Hook*, 558 U.S. 4, 16 (2009) (per curiam) (quoting *Strickland v. Washington*, 466 U.S. 668, 686 (1984)). To prevail on such a claim, the petitioner must show: (1) counsel's performance was deficient; and (2) the deficient performance prejudiced him. *Strickland*, 466 U.S. at 684-85. On the deficiency prong, the central question is "whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quoting *Strickland*, 466 U.S. at 690). In other words, counsel "need not be perfect, indeed not even very good, to be constitutionally adequate." *McAfee v. Thurmer*, 589 F.3d 353, 355-56 (7th Cir. 2009) (citation omitted); *see also Harrington*, 562 U.S.

at 110 ("[T]here is no expectation that competent counsel will be a flawless strategist or tactician.").

In evaluating counsel's performance, the Court must avoid employing the benefit of hindsight, and must respect its "limited role in determining whether there was manifest deficiency in light of information then available to counsel." *Premo v. Moore*, 562 U.S. 115, 125 (2011). Additionally, the Court must "evaluate [counsel's] performance as a whole rather than focus on a single failing or oversight." *Ebert v. Gaetz*, 610 F.3d 404, 411 (7th Cir. 2010). As the Seventh Circuit has instructed: "[I]t is essential to evaluate the entire course of the defense, because the question is not whether the lawyer's work was error-free, or the best possible approach, or even an average one, but whether the defendant had the 'counsel' of which the sixth amendment speaks." *Sussman v. Jenkins*, 636 F.3d 329, 351 (7th Cir. 2011) (citation omitted).

On the prejudice prong, the petitioner must establish a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is one that is "sufficient to undermine confidence in the outcome." *Id.* "In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." *Harrington*, 562 U.S. at 111. Instead, "[t]he likelihood of a different result must be substantial, not just conceivable." *Id.* at 112.

The Sixth Amendment right to counsel "extends to the plea-bargaining process." *Lafler v. Cooper*, 132 S. Ct. 1376, 1384 (2012). Such claims are governed by the same two-part test articulated in *Strickland*. *Missouri v. Frye*, 132 S. Ct. 1399, 1405 (2012). On the performance prong, a petitioner must show that counsel's representation in connection with the plea process

19

"fell below an objective standard of reasonableness." *Lafler*, 132 S. Ct. 1384 (quoting *Hill v. Lockhart*, 474 U.S. 52, 57 (1985)). In this context, the Court must take particular care to avoid the "distortions and imbalance that can inhere in a hindsight perspective[.]" *Premo*, 562 U.S. at 125. In evaluating counsel's performance, the Court must bear in mind that "the sentencing consequences of guilty pleas (or, for that matter, guilty verdicts) are extraordinarily difficult to predict." *United States v. Barnes*, 83 F.3d 934, 940 (7th Cir. 1996); *see also Bethel v. United States*, 458 F.3d 711, 717 (7th Cir. 2006) ("Because many questions about the facts and how a court or jury will apply the law to those facts cannot be answered by counsel with certitude, 'waiving trial entails the inherent risk that the good-faith evaluations of a reasonably competent attorney will turn out to be mistaken either as to the facts or as to what a court's judgment might be on given facts.'" (quoting *McMann v. Richardson*, 397 U.S. 759, 770 (1970))). Thus, "[a]n attorney must render advice in a good-faith effort to further his client's interests, but the Constitution does not guarantee that the advice will be correct." *United States v. Rice*, 116 F.3d 267, 269 (7th Cir. 1997); *see also Bethel*, 458 F.3d at 717 ("The salient question is whether counsel undertook a good-faith effort to determine the applicable facts and estimate the sentence[.]"); *Barnes*, 83 F.3d at 939-40 ("It is deficient performance for an attorney to fail to provide good-faith advice about the sentencing consequences of a guilty plea.").

In other words, "[a]n inaccurate prediction of a sentence alone" is not enough to establish deficient performance. *Bethel*, 458 F.3d at 717. This is true even when the attorney's mistake is significant, "as is the case when an attorney errs about whether his client will be classified as a career offender." *Barnes*, 83 F.3d at 940. On the other hand, if an attorney "grossly mischaracterized" the defendant's possible sentence when advising him in connection with a plea, this could establish deficient performance. *Thompson v. United States*, 732 F.3d 826, 830

(7th Cir. 2013); *see also United States v. Martinez*, 169 F.3d 1049, 1053 (7th Cir. 1999) ("We recognize that some predictions are such gross mischaracterizations that they provide a strong indication of constitutionally deficient performance." (internal quotation marks and alteration omitted)); *Bethel*, 458 F.3d at 717 ("Although a gross mischaracterization of the sentencing consequences of a plea may strongly indicate deficient performance, it is not proof of deficiency.").

To establish prejudice in the plea bargain context, a defendant must show that "the outcome of the plea process would have been different with competent advice." *Lafler*, 132 S.Ct. at 1384. To do so, he "must demonstrate a reasonable probability [he] would have accepted the earlier plea offer had [he] been afforded effective assistance of counsel." *Frye*, 132 S. Ct. at 1409. It is not enough to show that counsel gave the defendant inaccurate advice; counsel's advice must have been the "decisive factor" in the defendant's decision to accept or reject the plea. *Wyatt v. United States*, 574 F.3d 455, 458 (7th Cir. 2009). A defendant's "self-serving" testimony that he would have made a different decision with accurate advice need not be accepted at face value by the Court. *See Foster v. United States*, 735 F.3d 561, 566-67 (7th Cir. 2013); *see also Bethel*, 458 F.3d at 718 (observing that "[w]e have stated many times that a mere allegation by the defendant" that he would have proceeded differently with accurate advice "is not sufficient to establish prejudice"). The Court should also consider such factors as the history of plea negotiations, including whether the defendant changed courses after receiving counsel's advice, and whether the error was likely to have impacted the defendant's decision under the circumstances of the case. *See Julian v. Bartley*, 495 F.3d 487, 499-500 (7th Cir. 2007); *Moore v. Bryant*, 348 F.3d 238, 242-43 (7th Cir. 2003).

To make a showing of prejudice, the defendant must also demonstrate that he was willing to meet the other terms of a plea offer, including admitting the factual basis of the plea and acknowledging "full culpability" if those were requirements of the plea. *Thompson*, 732 F.3d at 830. Finally, he must demonstrate a reasonable probability that the plea would have been accepted by the government and approved by the court if not for counsel's deficient performance. *Frye*, 132 S. Ct. at 1409. These two showings are "of particular importance because a defendant has no right to be offered a plea nor a federal right that the judge accept it[.]" *Id.* at 1410 (internal citations omitted). With those principles in mind, the Court turns to their application in this case.

## I. Deficient Performance

As a preliminary matter, Petitioner argues that the above-cited Seventh Circuit cases employing "good-faith" language are no longer valid after the Supreme Court's decisions in *Lafler* and *Frye*. (R. 61, Pet'r's Br. at 24-25.) In his view, *Lafler* and *Frye* adopted an objective standard for assessing counsel's performance, which in essence overturned *Barnes* and the other Seventh Circuit cases referring to counsel's "good-faith" efforts. (*Id.*) There is no question that an ineffective assistance claim is ultimately assessed under an objective standard of reasonableness. This was the standard long before *Lafler* and *Frye* were decided; it is the same standard employed in *Strickland*, which the Supreme Court in *Hill* made applicable to claims of ineffective assistance at the plea bargain stage. *See Hill*, 474 U.S. at 58 (holding that "the two-part *Strickland v. Washington* test applies to challenges to guilty pleas based on ineffective assistance of counsel"); *Strickland*, 466 U.S. at 687-88 ("When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness.").

Nevertheless, in applying *Hill* and *Strickland*, the Seventh Circuit has repeatedly recognized that sentencing predictions made in the context of plea negotiations are unique, given the inherent uncertainty surrounding what sentence may ultimately be imposed by the court; even reasonably competent attorneys acting in good faith can predict inaccurately. *See, e.g., Bethel*, 458 F.3d at 717; *Julian*, 495 F.3d at 496; *United States v. Cieslowski*, 410 F.3d 353, 358-59 (7th Cir. 2005); *Moore*, 348 F.3d at 241; *Barnes*, 83 F.3d at 939-40. The Seventh Circuit has continued to rely on this line of cases even after *Lafler* and *Frye* were decided. *See Thomas v. United States*, --- Fed. App'x ----, 2015 WL 1543155, at *2 (7th Cir. Apr. 8, 2015) (citing *Barnes, Bethel*, and *Cieslowski*); *Thompson*, 732 F.3d at 830-31 (citing *Julian* and *Cieslowski*). District Courts in this Circuit have continued to rely on them as well. *See, e.g., United States v. Torres-Chavez*, No. 14 C 9405, 2015 WL 508184, at *3 (N.D. Ill. Feb. 5, 2015) (St. Eve, J.); *United States v. Rosas*, No. 10 CR 61, 2014 WL 2195199, at *6 (N.D. Ind. May 27, 2014) (Springmann, J.); *Robles v. United States*, No. 13 C 3214, 2013 WL 6153042, at *3 (N.D. Ill. Nov. 22, 2013) (Kendall, J.). Unless these cases are overruled by the Seventh Circuit, they remain binding on this Court. In any event, the Court does not view these cases as intending to create a lower bar for counsel's performance than the objective standard articulated in *Hill* or *Strickland*. It is merely a different formulation of the same question: What would a reasonable attorney have done under the same circumstances, bearing in mind that a defendant is not entitled to a defense that is "error-free." *See Sussman*, 636 F.3d at 351.

Considering that question here, Petitioner argues that Blegen's failure to discover that he qualified as a career offender, and to advise him of this fact at the time of the government's mid-trial plea offer, fell below an objective standard of reasonableness. (R. 61, Pet'r's Br. at 20-46; R. 67, Pet'r's Reply at 5-24.) His argument is premised in large part on the testimony of his

expert, Cattamanchi, a Federal Defender with approximately eight years of experience in the Northern District of Indiana. (Tr. at 255-59.) Cattamanchi testified that in his view, "minimum professional standards" require that, in every case where a defendant is charged with a federal drug offense or a crime of violence, a defense attorney must gather the following documents: the Pretrial Services Report; underlying court documents related to every felony conviction for a crime of violence; and underlying court documents related to every felony conviction for a drug crime, even possession offenses. (Tr. at 262-63.) Cattamanchi opined that an attorney acts below minimum professional standards if he fails to take these steps in every case. (Tr. at 264-72.)

Cattamanchi based his opinion on the ABA Standards of Criminal Justice relating to guilty pleas, (Tr. at 259, 300-01), which direct that a defense attorney should investigate a defendant's prior record in providing advice regarding a plea. *See* ABA Standards of Criminal Justice, Guilty Pleas 14-3.2(b) & Commentary to Guilty Pleas Standard 123 (3d ed. 1999). While the ABA Standards can be "important guides" in assessing an attorney's performance, they are not the sole determinant. *See Frye*, 132 S. Ct. at 1408; *see also Strickland*, 466 U.S. at 688-89 ("No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant."). As the Supreme Court recognized in *Frye*, "[t]he alternative courses and tactics in negotiation are so individual that it may be neither prudent nor practicable to try to elaborate or define detailed standards for the proper discharge of defense counsel's participation in the process." *Frye*, 132 S. Ct. at 1408.

Additionally, the ABA Standards do not specifically require that a defense attorney obtain the documents referenced by Cattamanchi in every case; this was simply Cattamanchi's

interpretation. (Tr. at 301-02.) The Standards are actually far more general. For instance, ABA Standards for Criminal Justice, Pleas of Guilty 14-3.2(b) provides:

> To aid the defendant in reaching a decision, defense counsel, after appropriate investigation, should advise the defendant of the alternatives available and address considerations deemed important by defense counsel or the defendant in reaching a decision. Defense counsel should not recommend to a defendant acceptance of a plea unless appropriate investigation and study of the case has been completed.

The Commentary to the Standards further provides: "[I]t is defense counsel's responsibility to investigate not only the facts concerning the offense, but also facts that go to the defendant's potential sentence, including his or her prior record." ABA Standards of Criminal Justice, Commentary to Guilty Pleas Standard 123. Although the Standards recognize that an attorney should conduct an "appropriate" investigation in connection with a plea offer, the Commentary notes that what constitutes an appropriate investigation will vary from case to case, and in some circumstances "may be quite limited." *See* ABA Standards for Criminal Justice, Commentary to Guilty Pleas Standard 123. The Commentary further notes: "It should be emphasized that *this Standard requires counsel to do more than the constitutional minimum*[.]" *Id.* at 122 (emphasis added). Therefore, lack of compliance with the ABA Standards does not necessarily establish deficient performance for purposes of the Sixth Amendment.

The Court also considers that while Cattamanchi was quite knowledgeable about sentencing issues, his experience may be somewhat skewed. He testified that the vast majority of the roughly three hundred cases he handled during his career were resolved by a plea

agreement without a trial.[10] (Tr. at 302-07.) Cattamanchi also acknowledged that he never represented a defendant in connection with a RICO charge, let alone handled a lengthy RICO trial. (Tr. at 311.) There is no question that in following his standard practices, Cattamanchi provides excellent representation for all of his clients who are contemplating a guilty plea. The question for the Court is whether this standard is constitutionally required for all cases regardless of the circumstances. More pointedly, is Cattamanchi's proposed standard required for an attorney gearing up for—or in the middle of—a lengthy and complicated RICO trial with a client who is focused on a good trial defense. Under the circumstances presented here, Cattamanchi's testimony was helpful but the Court cannot find it conclusive.

There is no question that an attorney has an affirmative duty to conduct a reasonable investigation in every case, including where necessary conducting an investigation of the defendant's prior criminal record. *See, e.g., Porter v. McCollum*, 558 U.S. 30, 39-40 (2009); *Rompilla v. Beard*, 545 U.S. 374, 381-83 (2005); *Wiggins v. Smith*, 539 U.S. 510, 521-23 (2003); *Williams v. Taylor*, 529 U.S. 362, 396 (2000). There is also no question that the consequences of being deemed a career offender can be "grave." *United States v. Hoults*, 240 F.3d 647, 648 (7th Cir. 2001). As outlined above, however, Blegen was attuned to this issue and did in fact make a reasonable effort to investigate Petitioner's rather extensive criminal record.[11] Blegen testified that his practice regarding obtaining the actual underlying records of prior convictions is based

---

[10] In some of these cases, Cattamanchi represented the defendant on a supervised release violation, but another attorney handled the underlying resolution of the case. (Tr. at 307.) Cattamanchi acknowledged that he is not admitted to the Northern District of Illinois and is not familiar with some of the practices of the U.S. Attorneys' Office here, including the practice of including all prior relevant convictions in the same 851 Notice. (*See* Tr. at 299-300.)

[11] The Pretrial Services Report reflects that in addition to the manufacture/delivery of cannabis conviction which Blegen misread, Petitioner also had prior convictions for manufacture/delivery of cocaine, felony escape, damage to property, obstructing justice, and domestic battery (as well as a violation of the terms of his conditional discharge for that offense). (R. 61-21, Pretrial Services Report at 293-94.)

on the specific circumstances presented in a particular case. (Tr. at 205.) He explained that he may obtain such records where, for example, a defendant disputes that he sustained a particular conviction, or if a conviction is particularly significant. (Tr. at 204.) In Petitioner's case, Blegen mistakenly believed, based on his prior experience in state court and the sentence of probation, that the prior conviction at issue was for marijuana possession, and therefore he did not find it necessary to obtain additional records.[12] (Tr. at 204.) It might have been best for Blegen to obtain additional documentation pertaining to Petitioner's state convictions, and in such case the error might have been revealed. But deviation from "best practices" or "most common custom" is not the standard for establishing ineffective assistance of counsel. *See Richter*, 562 U.S. at 105. Given the exigencies involved and the information known to Blegen, the fact that he chose to focus on preparing for a complicated, months-long trial rather than ordering or analyzing state criminal records does not appear wholly unreasonable to this Court, particularly in light of Petitioner's desire to proceed to trial and his general reluctance to plea and agree to a factual basis to a plea or to proffer with the government.

Additionally, although Petitioner may not have known about his career offender status when he declined the government's mid-trial plea offer, he did have several other key pieces of accurate information. He knew that if he proceeded with the trial, the government was going to seek a life sentence, (Tr. at 89-90); that if he lost on the drug quantity finding, he would be facing a mandatory minimum sentence of 20 years, (Tr. at 91); and that all but one of the defendants had been convicted on the RICO conspiracy charge in the trial that proceeded before this Court, (Tr. at 87). Blegen credibly testified that he advised Petitioner more than once that if

---

[12] Cattamanchi agreed that Petitioner's NCIC rap sheet was "a little bit unusual," but testified that it did not confuse him given his extensive experience in reviewing criminal history records. (Tr. at 283.)

his withdrawal defense did not succeed and he was convicted, he would be looking at a likely sentence of at least 20 years, and possibly life. (Tr. at 165-68, 177.) Blegen also credibly testified that he advised Petitioner that he could be held responsible for the violence committed by other gang members under the RICO count and, if he did, he would be facing a possible life sentence. (Tr. at 165, 177.) Blegen hoped that Petitioner would not be held accountable for these acts, but in his words: "I don't make promises . . . I never promise anybody any specific guideline." (Tr. at 177, 179.) Such advice was in fact consistent with the Standards recognized by the ABA. *See* ABA Standards for Criminal Justice, Commentary to Guilty Pleas Standard 122 ("There is nothing wrong . . . with a lawyer's giving his client the benefit of his judgment as to what the court is likely to do, always making it clear that he is giving advice, not making a promise[.]" (internal quotation marks and citation omitted)).

Much of Petitioner's account coincides with Blegen's, although he could not recall certain aspects of Blegen's advice and offered vague testimony that Blegen "made [him] understand that it could be possible" to get a sentence of less than 15 years even if he lost at trial. (Tr. at 93.) This contradicts Blegen's explicit testimony that he told Petitioner more than once that he was looking at a sentence of 20 years or more if he lost at trial. (Tr. at 168.) The Court credits the testimony of Blegen, an experienced defense attorney in this District, who testified against his own interest in this case and candidly admitted his own error. At best, the Court attributes the discrepancy to wishful thinking on Petitioner's part, and at worst, to revisionist history aimed at gaining the benefit of a plea offer Petitioner clearly rejected at the time it was made. Based on the record, the Court cannot conclude that Blegen "grossly mischaracterized" the possible sentence Petitioner was facing. *See Thompson*, 732 F.3d at 830.

In fact, Blegen was accurate in predicting that Petitioner would receive a sentence of around 20 years if he lost at trial. (Tr. at 168, 177.) Although Blegen did not foresee that Petitioner would qualify as a career offender, as it turned out, Petitioner's career offender status had little actual significance in terms of sentencing. The PSR calculated Petitioner's total offense level on the RICO conspiracy count as a level 46, which was adjusted to level 43—the maximum offense level allowable under the Guidelines. (Tr. at 224; R. 61-32, PSR at 661.) This offense level was driven by the violence underlying the RICO conspiracy; the government proved at trial that the Insane Deuces had committed three murders (including the murder of a 14-year-old boy) and eight attempted murders during 2002 and 2003 alone. (R. 61-32, PSR at 650-51.) Offense level 43 carries an advisory Guidelines sentence of life, regardless of a defendant's criminal history category. *See* U.S.S.G., Ch. 5, Pt. A, Sentencing Table; *see also United States v. McBride*, 724 F.3d 754, 756 (7th Cir. 2013) ("Level 43 is life, period—a point, not a range."). Petitioner was ultimately sentenced to a far lower sentence of 20 years on the RICO count and 20 years on the drug count, to run concurrently. (R. 50, Stip. Facts ¶ 25.) Thus, Petitioner's career offender status did not actually result in a significantly higher sentence than what was predicted by Blegen.

Blegen's oversight was unfortunate, but the record reflects that he made a reasonable investigation of Petitioner's prior criminal record. He considered this issue both at the outset of the case and again when the mid-trial plea offer was made. (Tr. at 126-29.) He was aware of the applicable law, reviewed Petitioner's NCIC rap sheet, and spent approximately 12 hours researching the Guidelines and discussing his calculations with Petitioner in connection with the plea offer. (Tr. at 135-37; R. 61-16, Interim Billing Records of 12/15/08 at 109-110, 119-20.) Blegen's advice to Petitioner about his likely sentence (20 years), and the worst case scenario if

he lost at trial (life imprisonment) was accurate. (Tr. at 156-180.) He simply made a mistake in assessing whether Petitioner had enough predicate offenses to qualify as a career offender. (Tr. at 136-37.) Indeed, an experienced federal prosecutor also did not realize Petitioner qualified as a career offender, even though he made his own Guidelines calculation prior to trial. (Tr. at 237.)

Under the circumstances of this case, the Court cannot conclude that Blegen failed to make a reasonable inquiry or otherwise fell below an objective standard of reasonableness in connection with his sentencing predictions. *See Barnes*, 83 F.3d at 940 (defendant failed to establish ineffective assistance even though counsel was unaware he qualified as a career offender until counsel received the PSR; counsel "may not have taken the utmost care" in connection with his sentencing calculation, but the record did not show that counsel failed to make a good-faith investigation of defendant's possible sentence); *Earle v. United States*, No. 97-2549, 1998 WL 133856, at *2 (7th Cir. Mar. 24, 1998) (counsel was not deficient even though he failed to discover facts revealing that defendant qualified as a career offender; counsel was aware of the applicable law and conducted a reasonable investigation into the defendant's criminal record, but simply made a mistake in his sentencing calculation); *see also Cieslowski*, 410 F.3d at 359 (even though defense counsel failed to recognize that defendant qualified for a significantly lower sentence based on the Guidelines, the defendant failed to establish deficient performance because counsel made a good-faith effort in connection with her sentencing prediction); *United States v. Teller*, 762 F.2d 569, 577-78 (7th Cir. 1985) (declining to find deficient performance even though counsel's advice involved an error that "even a reasonably competent first year law student" should have been aware of, where counsel was reasonably accurate in advising defendant of the risks of going to trial and the worst case scenario if he lost).

The Court also cannot consider Blegen's error in a vacuum, and instead must consider his overall performance during this complex and difficult case. *See Sussman*, 636 F.3d at 351; *see also Harrington*, 562 U.S. at 111 ("[I]t is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy."). The record shows that Blegen entered his appearance just two months before the original trial date. (*Delatorre*, R. 689, Appearance.) At that point the charges had been pending against Petitioner for more than two years, and the pretrial discovery was "voluminous." (*See* R. 50, Stip. Facts ¶¶ 3-4; Tr. at 353.) Blegen agreed to take over the case from a colleague; he was told that Petitioner wanted to go to trial and that the trial date could not be moved. (Tr. at 173.) Accordingly, he began quickly preparing for trial. He met with Petitioner on the same day he filed his appearance, and his notes reflect that the two immediately began discussing trial strategies and pretrial motions that needed to be filed. (R. 61-6, Meeting Notes of 1/30/08.) Blegen met with Petitioner two more times in February 2008, and they again had detailed discussions about the upcoming trial. (R. 61-7, Meeting Notes of 2/11/08; R. 61-8, Meeting Notes of 2/14/08.) Although Petitioner made a general inquiry about the possibility of a plea, he confirmed his desire to proceed to trial in correspondence he sent to Blegen shortly before the scheduled trial date. (R. 61-2, Letter of 3/11/08.)

The record reflects that within a few weeks of filing his appearance, Blegen filed multiple documents on Petitioner's behalf, including: a motion to dismiss the indictment, (*Delatorre*, R. 798); a motion for a bill of particulars, (*id.*, R. 799); a motion to adopt various pretrial motions filed by Petitioner's co-defendants, (*id.*, R. 801); a motion *in limine*, (*id.*, R. 800); proposed voir dire questions (*id.*, R. 849); and a motion seeking authorization for all of the defendants to obtain the services of an investigator, (*id.*, R. 866). Blegen's billing records reflect that in the first eight

weeks, he spent roughly 140 hours working on Petitioner's case. (R. 61-14, Interim Billing Records of 3/11/08.) Blegen met with Petitioner again after the mistrial was declared, and although Petitioner made a general statement that he would consider a plea, he ultimately told Blegen that he wanted to "wait and see what happens" in the trial of the other group of defendants. (Tr. at 143-44; R. 61-9, Meeting Notes of 4/4/08.) Accordingly, Blegen continued to focus on preparing for a retrial. He moved for Petitioner's temporary release on bond,[13] (*Delatorre*, R. 1019); moved to sever Petitioner's trial from the other defendants (*id.*, R. 1023); submitted new voir dire questions (*id.*, R. 1024); and moved to admit grand jury testimony in support of Petitioner's withdrawal defense, (*id.*, R. 1096). Blegen's billing records reflect that between March 2008 and December 2008, he spent more than 400 hours working on Petitioner's case. (R. 61-15, Interim Billing Records of 9/30/08; R. 61-16, Interim Billing Records of 12/15/08.)

The trial transcripts also reflect that Blegen was a zealous advocate for Petitioner during the lengthy trial, putting the government's evidence to the test every step of the way. He raised countless objections, (*see Delatorre*, Trial Tr. at 218, 463, 488, 506, 508, 601, 606, 704, 716, 767, 1173, 1619); gave an opening statement, (*id.* at 107-21); cross-examined the government's

---

[13] Blegen received a Pretrial Services Report in connection with his emergency bond motion, which often includes information about a defendant's criminal history; however, that particular report did not include any information about Petitioner's criminal record other than to state in general terms that he had "[c]onvictions for drug related and violent offenses." (*See* Tr. at 146-47; R. 61-22, Pretrial Services Report Dated 8/19/08 at 299.)

witnesses, including conducting an extensive cross-examination of Rivera,[14] (*id.* at 360-76,

1432-1507, 2025-27, 2845-46, 2848, 3296-3301); requested various limiting instructions, (*id.* at

337, 1291, 1512, 3651, 3859); raised an issue regarding the jurors' handling of transcripts, (*id.* at

694); moved for a judgment of acquittal at the close of the government's case, (*id.* at 3839-40),

presented witnesses and evidence on Petitioner's behalf, (*id.* at 4006-29); actively participated in

the jury instruction conference, (*id.* at 4154-4173); made recommendations regarding the drug

quantity findings being submitted to the jury, (*id.* at 4195-96); objected during the government's

closing argument, (*id.*, Tr. at 4724, 4764, 4802); made his own lengthy closing argument, (*id.* at

4470-4535); voiced his views regarding a note received from the jury, (*id.* at 4944); moved for a

mistrial based on a problem with the jury, (*id.* at 5006); argued to the jury at the special verdict

phase, (*id.* at 5060-65); and argued on Petitioner's behalf at sentencing, not only arguing the

applicable law but attempting to paint Petitioner as a hard-working family man who had

experienced many difficulties in his life, (Sentencing Tr. at 2-114).

As Blegen predicted, the jury ultimately held Petitioner liable for lower drug quantities

than were sought by the government. In the special verdict phase, the jury found Petitioner

responsible for distributing less than 500 grams of cocaine, and found him not responsible for

distributing cocaine base or marijuana. (*See* Tr. at 180; R. 50, Stip. Facts ¶ 21.) These findings

were significant because they lowered Petitioner's statutory maximum sentence to 20 years on

the RICO count and 30 years on the distribution count, with no applicable mandatory minimums,

---

[14] Although Petitioner's withdrawal defense was ultimately unsuccessful, during Blegen's cross-examination of Rivera, he obtained several favorable admissions in support of this defense, including that it was possible to "retire" from the Insane Deuces; that Petitioner believed himself to have retired from the gang; and that following the roll-back Petitioner was notably absent from several gang events that he was expected to attend. (*See Delatorre*, Trial Tr. at 1432-1507.) Blegen opined at the evidentiary hearing, and the Court agrees after reviewing the trial transcript, that it took "a lot of fighting to get the[se] answers." (Tr. at 151.)

which left considerable discretion to Judge Leinenweber at sentencing. (Tr. at 180, 282-83.)
Judge Leinenweber ultimately sentenced Petitioner to 20 years on the two counts, with the
sentences to run concurrently—a far lower sentence than the 50 years recommended by
probation, and the 30 years to life recommended by the government. (R. 50, Stip. Facts ¶ 25; R.
61-33, Sentencing Recommendation at 677; Tr. at 241-42.) The record strongly suggests that
Petitioner's 20-year sentence was the culmination of significant efforts by his skilled attorney.

The Constitution did not entitle Petitioner to a defense that was "error-free"; rather, the
question is "whether the defendant had the 'counsel' of which the sixth amendment speaks."
*Sussman*, 636 F.3d at 351. Based on the record, the Court concludes that Petitioner had such
representation. Notwithstanding the unfortunate error Blegen made in connection with
Petitioner's career offender status, the Court finds that his performance was not deficient under
the Sixth Amendment.

## II.     Prejudice

Even if Blegen's performance could be considered deficient, Petitioner also must
demonstrate a reasonable probability that he would have accepted the plea, and that the plea
would have been accepted by the government and approved by the court, if not for Blegen's
error. *Frye*, 132 S. Ct. at 1409. Petitioner has not made that showing here. First and foremost,
he has not established a reasonable probability that he would have accepted the government's
plea offer in the absence of an error by Blegen. With the benefit of hindsight, Petitioner now
claims that he rejected the plea solely because Blegen did not advise him of his career offender
status. (*See* Tr. at 67, 71.) The Court does not find this assertion credible in light of the other
evidence. The record shows that at the time of the government's mid-trial plea offer, Petitioner
knew that he faced a potential mandatory minimum penalty of 20 years, and that the government

fully intended to seek a life sentence if he lost at trial. (Tr. at 89-91.) He thus knew that rejecting the government's plea offer involved serious risks.

Notwithstanding this knowledge, Petitioner elected to proceed with the trial. The record shows that he had several reasons for doing so. First, he felt that his withdrawal defense was strong and that it was possible for him to beat the charges entirely. (Tr. at 55-56, 70, 83.) In his view, the fact that the government had approached his attorney with an offer in the midst of trial meant that "we were in a really good position."[15] (Tr. at 55.) The record reflects that Petitioner did not reach this determination lightly, but only after he had carefully reviewed the transcripts and pleadings from the trial of the other group of defendants. (*See* R. 61-2, Letter of 3/11/08; Tr. at 49-50, 149.) The record shows that Petitioner was an active and knowledgeable participant throughout the case, frequently giving Blegen suggestions about weaknesses in the government's evidence, strategies that he might consider, and case law pertaining to the scope of his criminal liability and sentencing exposure. (*See* Tr. at 82-83; R. 61-2, Letter of 3/11/08; R. 61-3, Letter of 4/08/08; R. 61-4, Letter of 4/27/08; R. 61-5, Letter of 8/21/09.) At the evidentiary hearing, Blegen characterized Petitioner as "smart," (Tr. at 175), and after having observed Petitioner's testimony, the Court shares in that assessment.

Additionally, at the time the mid-trial plea offer was made, Petitioner "thought 15 [years] was too much" and he wanted a sentence of less than 15 years, which the government was not willing to offer. (Tr. at 92; *see also* Tr. at 58.) Petitioner also did not want to provide any information to the government about the Insane Deuces out of concern for his own safety. (Tr. at 98, 163-64, 187-88; R. 61-11, Meeting Notes of 11/10/08 at 17.) Such concerns were certainly

---

[15]  In fact, one of the prosecutors testified that the government's purpose in engaging in mid-trial plea discussions with Petitioner was to "get that [withdrawal] defense out of the courtroom which complicated the case, as well as, frankly, get Mr. Blegen out of the courtroom, who was perceived as the best attorney in that room." (Tr. at 222.)

reasonable. The leyas of the gang required that members adhere to a strict "code of silence." (R. 61-38, Leyas of the Insane Deuces at 753.) There was evidence presented at trial that Insane Deuces had attempted or carried out violence against other gang members who were believed to be cooperating with police. *See Morales*, 655 F.3d at 617-18; *Benabe*, 436 Fed. App'x at 645. Finally, Petitioner told Judge Leinenweber at sentencing that "[b]y going to trial, I was hoping that the jury and everyone else would see that I had made changes." (*Delatorre*, Sentencing Tr. at 89.) Whatever the validity of these reasons, they were *Petitioner's* reasons, and they cannot be attributed to any failing by Blegen.

As to the proffer requirement, Petitioner now insists that he was willing to proffer as part of a plea, but the Court does not find this assertion credible in light of the record. (*See* Sealed Tr. at 72.) Even now, long after the trial has ended and with the courtroom sealed, Petitioner was—suffice it to say—less than forthcoming when the government asked him about his own criminal conduct and that of other Insane Deuces during his many years in the gang.[16] (*See* Sealed Tr. at 113-16.) The Court also considers Petitioner's body language during this portion of the hearing, which suggested to this Court that he was not being fully truthful about his intentions at the time of trial or his willingness to provide full and truthful information to the government as required in any proffer session.

In fact, Petitioner's own words at the time of sentencing indicate that he did not seriously consider pleading guilty, even knowing he was facing a potential life sentence. In a letter written to Blegen in August 2009, Petitioner stated: "I didn't know I was a career offender! If I did, I *might* have considered a plea!" (R. 61-5, Letter of 8/21/09 at 9) (emphasis added). This is quite different from what he claims now—that he would have taken the plea if only Blegen had

---

[16] At the request of Petitioner's counsel, the Court sealed the courtroom during Petitioner's testimony pertaining to the substance of a potential proffer. (*See* Tr. at 17-18.)

advised him about his career offender status. Based on the record, Petitioner has not demonstrated that Blegen's error was the "decisive factor" in his decision to reject the government's plea offer. *See Wyatt*, 574 F.3d at 457; *see also Foster v. United States*, 735 F.3d 561, 566-67 (7th Cir. 2013) (defendant's self-serving statement during Section 2255 hearing that he would have accepted a plea if given accurate advice by counsel failed to establish prejudice, where other evidence showed that defendant was unwilling to accept a plea at the time of trial).

Because the evidence does not show that Petitioner was willing to proffer at the time of trial, he also cannot demonstrate a reasonable probability that the plea would have been approved by the government or the court in the absence of Blegen's error.[17] *See Frye*, 132 S. Ct. at 1409. Despite some minor differences in the testimony of the witnesses, the record is clear that a key part of any plea agreement would have been a full and truthful accounting by Petitioner of his own activities and that of his co-defendants during his many years in the gang. (Tr. at 68-70, 161, 183, 222, 229-32, 246-47, 376-79; *see also* R. 61-11, Meeting Notes of 11/10/08 at 17.) The Court finds that Petitioner was not willing to provide such an accounting at the time of trial, or for that matter, at present. *See Thompson*, 732 F.3d at 830 (Section 2255 petitioner failed to establish prejudice in connection with his claim that counsel's erroneous advice caused him to reject a favorable plea, because "even now, he refuses to acknowledge his full culpability as would be required under the plea offer"). Accordingly, he has not made the necessary showing of prejudice.

---

[17] To the extent there is a disagreement between the parties, the Court finds that there is sufficient evidence of a tangible plea offer made by the government. Although the offer was never reduced to writing or formally approved through the "supervisory chain" at the U.S. Attorneys' Office, the Court credits the statements of Blegen, an experienced criminal defense attorney in federal court, that if Petitioner was willing to proffer and accept either of the two proposed sentences, the plea agreement would have been a "done deal." (*See* Tr. at 159-60.)

The Court can fully appreciate Petitioner's desire to obtain the benefit of the 15-year plea offer, so that he can serve his time and return to his family more quickly. However, Petitioner chose to roll the dice at the time of trial with knowledge of the serious consequences he was facing. Based on the record, he has failed to demonstrate that Blegen provided him with ineffective assistance in connection with that decision. Accordingly, the Petition will be denied.

## III. Certificate of Appealability

As a final matter, the Court must consider whether to grant Petitioner a certificate of appealability. To obtain a certificate of appealability, Petitioner must make a substantial showing of the denial of a constitutional right by establishing "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks and citation omitted). Although this Court is not convinced that Petitioner received ineffective assistance from Blegen, reasonable jurists could reach a different conclusion. Accordingly, the Court will grant Petitioner a certificate of appealability.

## CONCLUSION

For the foregoing reasons, the Petition (R. 1) is DENIED. Petitioner is GRANTED a certificate of appealability on the following issue: Whether Petitioner was denied the effective assistance of counsel in violation of the Sixth Amendment when his counsel failed to advise him that he qualified as a career offender at the time of a mid-trial plea offer.

ENTERED: _____

**Chief Judge Rubén Castillo**
**United States District Court**

**Dated: April 28, 2015**